UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
KARO MUMESSILLIK VE DIS TISCARET         :
LTD. STI,                                :
                                         :
                    Plaintiff,           :
                                         :   09 Civ. 3204 (HB)
         - against -                     :
                                         :   **OPINION & ORDER**
NAPOLI CHEMICALS KS and                  :
MARNAVI S.P.A.,                          :
                                         :
                    Defendants.          :
-----------------------------------------------------------------x

**Hon. HAROLD BAER, JR., District Judge:**

Plaintiff Karo Mumessillik Ve Dis Tiscaret Ltd. STI ("Plaintiff" or "Karo") filed its Verified Complaint against Defendants Napoli Chemicals KS ("Napoli") and Marnavi S.P.A. ("Marnavi") (collectively, "Defendants") in this proceeding on April 2, 2009. An *Ex Parte* Order granting a maritime attachment and garnishment was entered on April 3, 2009 (the "Rule B Attachment Order"). Napoli and Marnavi filed the instant motions on May 4, 2009 and May 8, 2009, respectively, seeking vacatur of the Rule B Attachment Order. Each Defendant makes arguments unique to its respective position, but they also share the common argument that the Rule B Attachment Order should be vacated because at least a portion (if not the entirety) of Karo's claim is not a valid *prima facie* admiralty claim, and even if it is, Karo is already sufficiently secured. Napoli has also moved for damages due to Karo's alleged bad faith in bringing its complaint in this matter. Oral argument on Defendants' motions was held on June 25, 2009. For the reasons that follow, Defendants' motions to vacate are granted, and Defendant Napoli's motion for damages is denied.

### I.  FACTUAL BACKGROUND

This case concerns the alleged contamination of cargo that was the subject of a charter party and bill of landing by and among Karo, Marnavi and Napoli. In approximately July 2007, Karo contracted to purchase, receive and take delivery of a cargo of Base Oil from Marnavi; the cargo was loaded onto the M/V IEVOLI GOLD (the "Vessel"), owned by Napoli, which Marnavi had chartered to deliver the cargo from Italy to Turkey, and a bill of lading issued. *See* Affidavit

1

of Rahul Wanchoo ("Wanchoo Aff.") Ex. A (Bill of Lading dated August 21, 2007).  Upon arrival at the port of discharge, it was discovered that the cargo had been contaminated by salt water.

According to the Verified Complaint, Karo brought suit against both Defendants[1] in the Court of First Instance in Turkey.  Pursuant to an order of the Turkish court, Karo arrested the Vessel and obtained security for the entire value of the cargo, which is alleged to amount to US $2,185,118.46.  *See* Wanchoo Aff. Ex. B (Turkish decree, dated August 29, 2007).  Karo was then able to resell the damaged cargo to a third party at a salvage sale for a reduced price of approximately $1.7 million, thereby mitigating its damages.  *See* Wanchoo Aff. Ex. C-2 (Sale invoice dated September 4, 2007).  Karo subsequently applied to the Turkish court to reduce the security to account for this mitigation of damages, attesting that the difference in sale price caused by the alleged contamination was $412,263.61, and that its lost profits were an additional $327,767.76, for a total damage claim of $740,031.37.  Based on Karo's representations, the Turkish court released the Vessel and reduced the security owed Karo to $800,000.  Accordingly, Napoli provided Karo with an irrevocable bank letter of guarantee in the amount of $800,000.  *See* Wanchoo Aff. Ex. D (bank letter of guarantee).

Subsequently, on September 10, 2007, Karo received a letter from the third-party buyer of the salvaged cargo stating that, despite the fact that the buyer had known there was some water damage to the cargo, which it thought could be dealt with through refining, further examinations showed that the cargo was in fact contaminated with salt water that had affected the chemical structure of the oil.  *See* Declaration of Rifki Baslamisli ("Baslamisli Decl.") Ex. 4.  Accordingly, the buyer advised that the cargo could no longer be used, and notified Karo that it was holding Karo "liable for [its] economic losses and [it] will take all legal steps to secure and compensate rights."  *Id.*  Karo has presented no further evidence of correspondence from the third-party buyer, nor any proceedings initiated against it by the third-party buyer.  Karo likewise did not alert the Turkish court of any need to increase its security to account for an additional potential claim against it by the third-party buyer.

Ultimately, the Turkish court dismissed the matter due to the arbitration clause in the bill of lading specifying that all claims must be pursued in arbitration in London.  That decision is currently on appeal before the Supreme Court of Appeals in Turkey.  Subsequently, to preserve its claim prior to the running of the statute of limitations, Karo submitted the dispute to arbitration in

---

[1] As discussed in further detail below, Marnavi vehemently argues that it was never, and is not now, a party to the Turkish litigation.

London as to Defendant Napoli.[2]  The arbitration proceedings are stayed pending the appeal of the Turkish court's dismissal of Karo's case.

## II.  PROCEDURAL HISTORY

On April 2, 2009, Karo filed its Verified Complaint alleging breach of maritime contract against Napoli and Marnavi for an aggregate claim of $3,715,338.84, including a principal claim of $2,572,854.85[3] as well as interest and estimated attorneys' fees and arbitration costs and expenses.  On April 21, 2009, Marnavi filed an Order to Show Cause why Karo should not be compelled to accept an undertaking in lieu of an order of attachment pursuant to Rule E(5)(a) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure and Rule E.1 of the Local Admiralty and Maritime Rules for the Southern and Eastern Districts of New York.  On April 28, 2009, this Court entered an Order approving the undertaking as substitute security (the "Bond Order") fixing the amount of the bond to be filed by Marnavi at $2,765,338.80.  Marnavi promptly posted a bond in this amount provided by the surety, International Fidelity Insurance Company.  Subsequently, Napoli and Marnavi filed separate motions to vacate the Rule B Attachment Order on May 4, 2009 and May 8, 2009, respectively.

## III. DISCUSSION

### A. Motions to Vacate the Rule B Attachment Order

The power to grant an attachment in maritime actions "is a unique aspect of admiralty jurisprudence that has deep historic and constitutional roots."  *Williamson v. Recovery Ltd. P'Ship*, 542 F.3d 43, 48 (2d Cir. 2008).  The attachment power "is an inherent component of the admiralty jurisdiction given to federal courts under Article III of the Constitution."  *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 437 (2d Cir. 2006) (citing U.S. Const. art. III, § 2).  The purpose of this power has been recognized as being twofold: "first, to gain jurisdiction over an absent defendant; and second, to assure satisfaction of a judgment."  *Id.*

Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims governs the process by which a plaintiff may attach an absent defendant's assets.  Rule B provides, in relevant part, that "[i]f a defendant is not found within the district . . . a verified complaint may contain a

---

[2] There is no dispute that Marnavi is not a party to the London arbitration.

[3] It is unclear how Karo has calculated its principal claim at just over $2.5 million, when the value of the damaged cargo is undisputed to have been $2,185,118.46.

3

prayer . . . to attach the defendant's tangible or intangible property – up to the amount sued for – in the hands of garnishees named in the process." Fed. R. Civ. P. Supp. R. B(1)(a).

Here, Defendants offer many and varied arguments in support of their respective motions to vacate, some of which are unique to their positions, and some of which are common to both Defendants. Napoli's arguments in support of vacatur of the Rule B Attachment Order are relatively straightforward. It contends that Karo's principal claim of approximately $2.5 million can be segregated into two claims – $800,000 for its damages to the cargo, as mitigated by its sale to the third-party buyer (the "contamination claim"); and approximately $1.7 million for an indemnity claim in the event it should be held liable to the third-party buyer of the cargo for damages due to the contamination (the "indemnity claim") – neither of which, Napoli contends, is a valid *prima facie* claim arising in admiralty. Specifically, Napoli argues that the $800,000 claim for damage to the cargo arises out of a contract for the sale of goods, which is not a maritime contract, and that because the $1.7 million claim is based on a potential future liability that Karo may owe to a third-party at some unknown time in the future, it is a premature or "unripe" contingent indemnity claim upon which no Rule B Attachment Order may issue. Napoli further contends that, in the event the Court should find that the contamination claim does arise in admiralty, Karo is adequately secured for that claim by the bank letter of guarantee issued by Napoli in Turkey and the $2.7 million bond already posted by Marnavi. Alternatively, Napoli argues that, if the entire principal claim is found to invoke admiralty jurisdiction, at the very least the Rule B Attachment Order should be reduced to credit the amount already secured by the bank letter of guarantee.

For its part, Marnavi argues that the Rule B Attachment Order should be vacated in its entirety (apparently including the $2.7 million bond it has already posted) because it was not a party to either the Turkish litigation or the London arbitration, and therefore Karo deserves no security for any claims as against Marnavi. In support of this contention, Marnavi has submitted numerous pleadings and documents of the Turkish court that fail to name Marnavi in the caption, the decision of the Turkish court dismissing Karo's claim and referring to the "defendant" in the singular, and a declaration of a Turkish solicitor explaining Turkish law and procedure indicating that Marnavi was never named or served in the Turkish litigation.[4] Moreover, Karo argues that

---

[4] Specifically, Marnavi's declarant, Turkish solicitor Elif Erbulun, attests that in Turkey, while judgments are public record, court files are maintained confidential and are not available to the public; rather, only litigants and their counsel are entitled to obtain and review court files. Declaration of Elif Erbulun

4

even if it were named in the Turkish litigation, that case has been dismissed in favor of arbitration in London, to which Marnavi is undisputedly not a party.  Further, Marnavi contends that it could not be added as a party to either the Turkish litigation or the London arbitration because all potential claims against it are now time-barred pursuant to the one-year statute of limitations under the International Convention for the Unification of Certain Rules of Law Relating to Bills of Lading ("Hague-Visby Rules").  Alternatively, similarly to Napoli's arguments, Marnavi contends that even if it could somehow be considered to be a party to either of these foreign litigations, the Rule B Attachment Order should nonetheless be vacated because the $1.7 million claim that is based on Karo's potential future liability to the purchaser of the oil is not a proper admiralty claim, and Karo is sufficiently secured for the amount of the $800,000 contamination claim under Napoli's bank letter of guarantee.[5]

Marnavi's arguments relating to whether it was properly named as a party to the Turkish litigation and whether any additional claims against it are time-barred are interesting and raise difficult issues of Turkish law and procedure, as explained in the dueling declarations of the parties' respective Turkish solicitors.  However, ultimately it will be unnecessary to wade through these murky issues because, as discussed below, even if Marnavi was properly and validly named as a party in either (or both) of the foreign litigations, vacatur of the Rule B Attachment Order is nonetheless warranted in this case.

> 1.    *$1.7 Million Contingent Indemnity Claim Is Not Valid Admiralty Claim*

As noted above, Karo's principal claim can best be understood as a claim for contamination of the cargo ($800,000) and a claim for indemnification for Karo's potential liability to the third-party buyer of the cargo (approximately $1.7 million).  Both Napoli and Marnavi argue that the latter portion of Karo's claim – the indemnity claim – is not a valid admiralty claim and thus cannot form the basis of a Rule B attachment.  I agree.

---

("Erbulun Decl.") ¶ 2.  Erbulun further states that he presented a duly issued power of attorney from Marnavi to the Eleventh Circuit of the Supreme Court of Turkey to obtain and review the files of the appeal of the Turkish litigation, but he was not granted access to the court files.  *See id.* at ¶¶ 3-4.  According to Marnavi, this indicates that the Turkish appellate court did not consider Marnavi to be a party to that litigation, and therefore it was not entitled to view the court documents.  Karo hotly disputes this interpretation of Turkish law and procedure and maintains that Marnavi was indeed a party to the Turkish litigation.  *See* Baslamisli Decl. ¶¶ 7-14, 24.

[5] The Defendants appear to part ways on whether the contamination claim states a proper *prima facie* admiralty claim, Napoli arguing that the bill of lading is nothing more than a contract for the sale of goods, while Marnavi concedes the bill of lading claim is a proper maritime carriage claim.

"In general, courts in the circuit have not been receptive to contingent indemnity claims as bases for maritime arrests for attachments." *Bang Guang Shipping Ltd. v. KN Resources PVT Ltd.*, 09 Civ. 1008 (WHP), 2009 U.S. Dist. LEXIS 45801, at *3 (S.D.N.Y. Apr. 27, 2009) (quoting *Sonito Shipping Co. Ltd. v. Sun United Mar. Ltd.*, 478 F. Supp. 2d 532, 540 (S.D.N.Y. 2007)). That is, because these claims are contingent on the resolution of an underlying dispute between the plaintiff and another party, courts generally find them to be "unripe" or "premature." *E.g.*, *Bottiglieri di Navigazione SPA v. Tradeline LLC*, 293 Fed. Appx. 36, 36-37 (2d Cir. 2008); *Bang Guang Shipping*, 2009 U.S. Dist. LEXIS 45801; *Aosta Shipping Co. Ltd. v . OSL S.S. Corp.*, 594 F. Supp. 2d 396 (S.D.N.Y. 2009); *Sonito*, 478 F. Supp. 2d 532; *J.K. Int'l, Pty., Ltd. v. Agriko S.A.S.*, 06-CV-13259 (KMK), 2007 U.S. Dist. LEXIS 10074 (S.D.N.Y. Feb. 13, 2007). In determining whether an indemnity claim states a valid *prima facie* admiralty claim, some courts have looked to whether the plaintiff's expectation of payment to a third party is reasonable, and/or how imminent such payment is likely to be. *See, e.g.*, *Exmar Shipping, N.V. v. Polar Shipping, S.A.*, 06cv12991(HB), 2008 U.S. Dist. LEXIS 65504, at *10-13 (S.D.N.Y. Aug. 27, 2008); *Navalmar (U.K.) Ltd. v. Welspun Gujarat Stahl Rohren, Ltd.*, 485 F. Supp. 2d 399, 404 (S.D.N.Y. 2007); *Daeshin Shipping Co. Ltd. v. Meridien Bulk Carriers, Ltd.*, 05cv7173, 2005 U.S. Dist. LEXIS 22409 (S.D.N.Y. Oct. 3, 2005). For example, in *Navalmar*, the indemnity claim was found to state a *prima facie* indemnity claim because plaintiff had already been required to file a $1 million bank guarantee in a foreign litigation brought by a third party to secure the consignee of the goods for the underlying damaged cargo. *Navalmar*, 485 F. Supp. 2d at 404 ("In effect, Navalmar has had to prepay a debt owed by it . . ., and should have the right by attachment to secure its claim against [the charterer] for indemnity. . . ."). However, where the plaintiff's obligation to pay the underlying claim to a third party is too speculative or remote, indemnity claims routinely are dismissed for lack of admiralty jurisdiction.

In this case, $1.7 million of Karo's principal claim against Defendants is based on an allegation that it is likely to be liable to the third-party buyer of the cargo for damage due to salt-water contamination. Karo contends that its concerns regarding its liability to the purchaser are more than reasonable, as the purchaser has "already introduced a claim against Karo seeking damages in the amount of USD $1,772,854.85," citing to the letter it received from the buyer in September 2007. However, that letter simply states that the buyer "hold[s] [Karo] liable for [its] economic losses and [it] will take all legal steps to secure and compensate rights." Baslamisli Decl. Ex. 4. Indeed, nearly a year after Karo received this "claim letter," its English solicitor

6

acknowledged that the buyer had merely "intimated that they intend to bring claims against" Karo, not that it had ever taken an additional action or filed any proceedings against Karo in any jurisdiction. Baslamisli Decl. Ex. 5. Karo has produced no evidence whatsoever to suggest that the purchaser of the cargo has taken any legal action on the underlying contamination claim since sending its letter in September 2007. Indeed, Napoli has submitted a declaration that, under Turkish law, any potential claim that could have been brought by the purchaser against Karo was time-barred as of March 10, 2008. *See* Reply Declaration of Sertac Sayhan ("Sayhan Decl.") ¶ 5. Accordingly, Napoli argues, the indemnity claim will never ripen into a valid admiralty claim. Karo has had ample opportunity to dispute this interpretation of Turkish law, or to produce some evidence that its expectation that it will have to pay the purchaser is reasonable and more than purely speculative, yet it has failed utterly to do so. In factually similar circumstances, Judge Sweet recently denied a request for counter-security that had been based on an allegation that the defendant had "received a claim for damages" from a third party and had submitted a letter from the third party requesting compensation for damages and asserting "if no appropriate actions are taken, we shall deal with this case using all available means and methods." *Beluga Chartering GMBH v. Korea Logistics Sys. Inc.*, 589 F. Supp. 2d 325, 330 (S.D.N.Y. 2008). Judge Sweet noted that defendant had not asserted that it had made any payment to the third party, or even that the third party had initiated an action against the defendant; "as such, [defendant's] indemnity claim [was] unripe, and therefore not a valid prima facie maritime claim within the meaning of Rule B." *Id.* (citations omitted). Likewise, here, without any indication that Karo has made, or is likely ever to make, any payments to the purchasers of the cargo, I find that its indemnity claim is premature and thus fails to state a valid *prima facie* admiralty claim.

However, such a finding does not necessarily end the inquiry, as the Second Circuit has held that "a district court *may* in some circumstances disregard the prematurity of a plaintiff's claim as a matter of discretion." *Patricia Hayes & Assocs. V. Cammell Laird Holdings U.K.*, 339 F.3d 76, 82 (2d Cir. 2003) (emphasis in original); *see also Greenwich Marine, Inc. v. S.S. Alexandra*, 339 F.2d 901, 905 (2d Cir. 1965) ("The inherent power to adapt an admiralty rule to the equities of a particular situation is entrusted to the sound discretion of the district judge sitting as an admiralty judge."); *J.K. Int'l*, 2007 U.S. Dist. LEXIS 10074 at *12. However, the circumstances in which the exercise of such discretion is warranted are "few" and "isolated" and

7

usually involve an "overwhelming equitable position of the plaintiff."[6] *See Greenwich Marine*, 339 F.2d at 905. As Judge Karas recently noted, "[i]n cases where courts of this district have chosen to exercise their discretion to uphold the plaintiff's attachment, there was some evidence in the record upon which the court could conclude that the plaintiff was likely to incur liability from a third party." *J.K. Int'l*, 2007 U.S. Dist. LEXIS 10074 at *15 (citing cases). As noted, there is no basis for any such conclusion in this case. Accordingly, there is no occasion for me to exercise discretion to uphold plaintiff's attachment, at least inasmuch as it was premised on the portion of the principal claim that accounts for the $1.7 million indemnity claim, and that portion of the attachment must be vacated.

### 2. *Karo is Sufficiently Secured For the Remainder of Its Claim*

As to the remaining portion of Karo's principal claim – the $800,000 contamination claim – there appears to be some disagreement between the Defendants as to whether the bill of lading on which Karo's claim is premised is a maritime contract. On the one hand, Napoli argues that the contract was merely one for the sale of goods (*i.e.*, the cargo), and therefore is not a maritime contract that gives rise to a claim in admiralty. *See, e.g.*, *Noble Resources Pte. Ltd. v. Metinvest Holding Ltd.*, 08 Civ. 11194 (PGG), 2009 U.S. Dist. LEXIS 30720, at *18 (S.D.N.Y. Apr. 10, 2009); *Marubeni Int'l Petroleoum (Singapore) Pte Ltd. v. Prestige Marine Servs. Pte Ltd.*, 591 F. Supp. 2d 386, 387 (S.D.N.Y. 2009); *EFKO Food Ingredients Ltd. v. Pacific Inter-Link SDN BHD*, 582 F. Supp. 2d 466, 471 (S.D.N.Y. 2008) ("[A] commodity, sale and purchase contract – even if the contract requires maritime transport relating to the shipment of the commodity – is not maritime in nature."); *Aston Agro-Industrial AG v. Star Grain Ltd.*, 06 CV 2805 (GBD), 2006 U.S. Dist. LEXIS 91636, at *7 (S.D.N.Y. Dec. 20, 2006). Based on its counsel's representations at oral argument, however, Marnavi apparently concedes that the contamination claim is a maritime claim based on a breach of a maritime obligation in the bill of lading. For its part, Karo contends that its claim is not premised on a claim of breach of a sale and purchase contract, but on a breach of a carriage contract for failure properly to inspect the cargo prior to issuing a "clean" bill of lading, which it characterizes as a traditional maritime claim. While in my view this is a

---

[6] Indeed, at least one court in this district has expressed skepticism as to whether such discretion has survived the Second Circuit's decision in *Aqua Stoli*, which directed that "a district court *must* vacate an attachment if the plaintiff fails to sustain his burden of showing that he has satisfied the requirements of Rule B and E." *See Sonito*, 478 F. Supp. 2d at 543 (quoting *Aqua Stoli*, 460 F.3d at 445) (emphasis added in *Sonito*). It is unnecessary for me to address this question, as I find that the compelling circumstances that might warrant the exercise of such discretion are absent in this case.

claim in admiralty, Karo has been fully secured over and above the value of that claim by the irrevocable bank letter of guarantee issued by Napoli in 2007. Principles of equity, which must reign in a court sitting in admiralty, dictate that Karo should not be entitled to the extraordinary remedy of a Rule B maritime attachment in this district for a claim for which it has been fully secured in a foreign jurisdiction. *See Aqua Stoli*, 460 F.3d at 436; *Chiquita Int'l Ltd. v. MV Bosse*, 518 F. Supp. 2d 589, 593, 598 (S.D.N.Y. 2007).

Karo has expressed some concern that, in the event Marnavi's arguments fail before the Turkish court and it is ultimately deemed to have been a party to the Turkish litigation, or alternatively in the event that Karo succeeds in adding claims against Marnavi in either the Turkish litigation or the London arbitration that are here argued to be time-barred, Karo will be left unsecured for any potential recovery against Marnavi. I leave that issue for another day and, I hope, another court. However, it is worth noting that, even if this were to happen, Karo has cited no authority that would allow this Court to sanction an attachment of assets based on a claim against one defendant when the claim has already been fully secured by another defendant. I decline in my discretion to allow such a result in this case. Accordingly, for now the Rule B Attachment Order against both Napoli and Marnavi must be vacated in its entirety.

### B.     Napoli's Motion for Damages

Napoli has also moved for damages in the form of attorneys' fees and costs as a result of what it alleges to be Karo's bad faith in bringing this action. "Generally, attorneys' fees awards in admiralty suits are discretionary and based on a finding of bad faith." *New York Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 130 (2d Cir. 2001). To show bad faith, a defendant must demonstrate clear evidence that the plaintiff has "commenced or conducted an action in bad faith, vexatiously, wantonly, or for oppressive reasons." *Dow Chem. Pac., Ltd. v. Rascator Mar. S.A.*, 782 F.2d 329, 344 (2d Cir. 1986). The Second Circuit in *Dow Chemical* went on to hold that "[t]o ensure that fear of an award of attorneys' fees against them will not deter persons with colorable claims, we have declined to uphold awards under the bad-faith exception absent both clear evidence that the challenged actions are entirely without color and are taken for reasons of harassment or delay or for other improper purposes." *Id.*; *see also Transfield ER Cape Ltd. v. STX Pan Ocean Co. Ltd.*, 09 Civ. 1250 (JGK), 2009 U.S. Dist. LEXIS 21185, at *14 (S.D.N.Y. Mar. 17, 2009) ("Under the bad faith standard, a finding of both meritlessness and improper motive is necessary.") (citing *Dolco Investment, Ltd. v. Moonriver Dev., Ltd.*, 526 F. Supp. 2d 451, 453

(S.D.N.Y. 2007)). Napoli does not pass the test, or, put another way, it fails to make the requisite showing by "clear evidence" of Karo's "meritlessness and improper motive," and its motion for attorneys' fees and costs is therefore denied.

## IV. CONCLUSION

For the foregoing reasons, the Defendants' motions to vacate the Rule B Attachment Order are GRANTED. Napoli's motion for damages is DENIED. The Clerk of the Court is instructed to close these motions and to close this case and remove it from my docket.

**IT IS SO ORDERED.**
**New York, New York**
~~July ___, 2009~~
August 3, 2009

_____
U.S.D.J.

10